United States District Court
Southern District of Texas
**FILED**

SEP 30 2024

Nathan Ochsner, Clerk

United States District Court
Southern District of Texas

**ENTERED**

September 30, 2024
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

| | | |
|---|---|---|
| **JAMES E. FITZGERALD,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 7:23-CV-0209** |
| | § | |
| **MARTIN O'MALLEY, Commissioner of** | § | |
| **the Social Security Administration,** | § | |
| | § | |
| **Defendant.** | § | |

## REPORT AND RECOMMENDATION

Plaintiff JAMES E. FITZGERALD seeks judicial review of a final decision by the Commissioner of the Social Security Administration (the "SSA") denying Plaintiff's application for disability insurance benefits ("DIB").[1]  Pending is Plaintiff's complaint (the "Complaint"), whereby he requests reversal of the final decision and remand for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).  (Dkt. No. 1).  Primarily at issue is whether the Administrative Law Judge ("ALJ") erred in assessing Plaintiff's residual functional capacity ("RFC") to perform past relevant work for purposes of the fourth step of the five-step sequential disability evaluation.  Plaintiff contends that the ALJ discredited the opinions of his treating physicians concerning his physical functioning without justification (Dkt. No. 13 at 1, 5-13) and improperly excluded evidence of Plaintiff's mental limitations (*id.* at 1, 6, 13-20).[2]

---

[1] This suit was originally filed against Kilolo Kijakazi, the then-Acting Commissioner of the SSA. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley has been automatically substituted as a party.

[2] The substance of Plaintiff's claims is introduced in his brief (Dkt. No. 13), which is consistent with the typical procedure for Social Security judicial review.  Pursuant to Rules 2 and 5 of the Supplemental Rules for Social Security, an action for review of the Commissioner's final decision is initiated with a complaint, then specific claims are typically presented in the subsequent briefs.  *See Giselle N. v.*

The Commissioner has filed a certified transcript of the record underlying the instant action pursuant to sentence three of § 405(g) (Dkt. Nos. 8-10) and a responding brief (Dkt. No. 14). Through the brief, the Commissioner requests that the District Court affirm the ALJ's decision and deny the Complaint. (*Id.* at 13). According to the Commissioner, the ALJ discounted the medical opinions at issue based on substantial evidence (*id.* at 3-9) and properly excluded Plaintiff's mental limitations due to their lack of severity (*id.* at 9-13). Plaintiff has since filed a reply to the Commissioner's brief, largely reiterating the arguments made in his initial brief. (Dkt. No. 17). The Commissioner has not filed a reply.

This case was referred to the Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1). After review of the parties' briefing, the record, and relevant law, the Magistrate Judge RECOMMENDS that the Complaint (Dkt. No. 1) be DENIED, that the final decision of the Commissioner be AFFIRMED, and that this civil action be DISMISSED.

## I. SOCIAL SECURITY FRAMEWORK

### A. Five-Step Sequential Evaluation

Social Security is a program whereby the federal government, through the SSA, provides monetary benefits to eligible individuals with disabilities, among others. *United States v. Froehlich*, 2011 WL 13286700, at *1 (C.D. Cal. Feb. 25, 2011). In determining whether a claimant is disabled and entitled to benefits, the SSA applies the five-step sequential process articulated by 20 C.F.R. § 404.1520(a)(4), which involves asking whether:

> (1) the claimant is participating in substantial gainful activity; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the [SSA] regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform other relevant work.

---

*Kijakazi*, 694 F. Supp. 3d 1193, 1197 (N.D. Cal. 2023) ("[A] social security complaint could but need not always contain 'a short and plain statement of the grounds for relief' in order to state a claim for relief.").

*Winterroth v. Comm'r of Soc. Sec.*, 2021 WL 5639618, at *5 (S.D. Tex. Dec. 1, 2021) (citing *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995)).

In assessing the first step, a finding that the claimant is participating in substantial gainful activity—or work that involves significant physical or mental activities and is done for profit—precludes a finding of disability. 20 C.F.R. §§ 220.141, 404.1520(a)(4)(i).

If a claimant is not engaging in substantial gainful activity, the analysis proceeds to "step two," where it is determined whether the claimant has a medical impairment (or combination of impairments) that is "severe," or that significantly limits their ability to perform work activities. *Id.* §§ 220.102, 404.1520(a)(4)(ii), (c). The impairment must have lasted or be expected to last for a continuous twelve-month period unless it is expected to result in death. *Id.* § 404.1509.

At the third step, a determination that an impairment is of sufficient duration and meets or exceeds an impairment listed in the appendix to the applicable SSA regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 1, necessitates a finding of disability, such that the claimant is entitled to benefits, *id.* § 404.1520(a)(4)(iii), (d). Considered as part of the "step three" determination is any mental impairment, or "the degree of functional loss resulting from the impairment in four separate areas deemed essential for work." *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001); 20 C.F.R. § 404.1520a(c)(3), (d)(1), (2). This evaluation, referred to as the psychiatric review technique ("PRT"), concerns a claimant's ability to do the following: (i) understand, remember, or apply information; (ii) interact with others; (iii) concentrate, persist, or maintain pace; and (iv) adapt or manage oneself. *Owen v. Astrue*, 2011 WL 588048, at *14 (N.D. Tex. Feb. 9, 2011); 20 C.F.R. § 404.1520a(c)(3). The degree of limitation in these areas is rated on a five-point scale: (i) none, (ii) mild, (iii) moderate, (iv) marked, and (v) extreme. 20 C.F.R. § 404.1520a(c)(4). If the severity of the mental impairment meets or exceeds that of a mental disorder listed in the

applicable appendix and the impairment is of sufficient duration, the claimant is disabled and entitled to benefits. *See id.* §§ 404.1520(a)(4)(ii), (d), 404.1520a(d)(2), (3).

If the third step is not satisfied, the analysis proceeds to "step four," where the claimant's RFC is assessed and it is determined whether the claimant can still perform the requirements of any past relevant work. *Id.* § 404.1520(a)(4)(iv), (e), (f). RFC refers to a claimant's ability to do physical and mental work activities on a regular and continuing basis despite any limitations from impairments. *Id.* § 220.120. A "regular and continuing basis" means eight hours a day for five days a week, or an equivalent work schedule. SSR 96-8P, 1996 WL 374184, at *1 (July 2, 1996). "Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. § 404.1560(b)(1) (2012). If the claimant's RFC allows them to complete past relevant work, then they are not disabled. *Id.* §§ 404.1520(a)(4)(iv), 404.1560(b)(3).

If a claimant cannot complete past relevant work, the analysis proceeds to the fifth and final step, where it is determined whether they can do any other work considering their RFC, age, education, and work experience. *Id.* § 404.1520(a)(4)(v), (g)(1). If the claimant is unable to do any other work considering these factors, they are disabled. *Id.* §§ 404.1520(a)(4)(v), (g)(1), 404.1560(c)(1). If the claimant can adjust to other work, they are not disabled. *Id.*

Although the claimant has the initial burden of proving disability, the burden shifts in the fifth and final step to the SSA to show that the claimant can perform work in the national economy. *Id.* § 404.1560(c)(2); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). To satisfy this burden, the SSA must produce vocational expert testimony or other similar evidence. *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986) (per curiam). The vocational expert will assess the effect of any limitation on a given range of work and then opine whether the claimant's RFC

permits them to perform substantial occupations within the range of work at issue. *Conaway v. Astrue*, 2008 WL 4865549, at \*4 (N.D. Tex. Nov. 10, 2008); *see also* SSR 00-4P, 2000 WL 1898704, at \*1-2 (Dec. 4, 2000). If the SSA's burden is met, the burden then shifts back to the claimant to show that they cannot perform the alternate work. *Fields*, 805 F.2d at 1170.

Typically relied on by vocational experts is the Department of Labor's Dictionary of Occupational Titles (the "DOT"), which provides "standardized occupational information to support job placement activities[,]" or list descriptions of the requirements for different jobs in the national economy.[3] *Dictionary of Occupational Titles* at xv (4th ed. 1991); *see also* SSR 00-4P, 2000 WL 1898704, at \*2; 20 C.F.R. § 404.1566(d)(1). Vocational experts regularly cite to the Specific Vocational Preparation (the "SVP") metric, which quantifies the time "required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Dictionary of Occupational Titles*, app. C (4th ed. 1991). SVP levels range from 1, which indicates that average performance requires only a short demonstration, to 9, requiring over 10 years of preparation. *Id.* While neither the vocational expert testimony nor the DOT is per se controlling, *see Carey v. Apfel*, 230 F.3d 146, 147 (5th Cir. 2000), the testimony should generally be consistent with the occupational information in the DOT, *see* SSR 00-4P, 2000 WL 1898704, at \*2.

In making disability determinations, the SSA considers medical opinions provided by medical sources, or licensed healthcare workers who work within the scope of their practice. *See* 20 C.F.R. §§ 404.1502(d), 404.1527. In assessing a medical opinion, the SSA considers six factors: (i) the physician's length of treatment of the claimant and frequency of examination; (ii) the nature and extent of the treatment relationship; (iii) the support of the physician's opinion

[3] The two volumes of the DOT are available at www.dol.gov/agencies/oalj/topics/libraries/LIBDOT (last visited July 19, 2024).

afforded by the medical evidence of record; (iv) the consistency of the opinion with the record as a whole; (v) the specialization of the treating physician; and (vi) other factors which tend to support or contradict the opinion.[4] *Id.* § 404.1527(c).

## B. Review of Non-Disability Determinations

A claimant may seek reconsideration of an initial finding of non-disability. *See* 42 U.S.C. § 1395ff(b)(1)(A). If the initial denial is upheld on reconsideration, a claimant may request a hearing before an ALJ, who will issue a written decision regarding the claimant's ostensible disability. *See* 20 C.F.R. § 404.1520a(e). A claimant may then request review of the ALJ's decision by the Social Security Appeals Council (the "Appeals Council") within sixty days of their receipt of notice.[5] *See id.* §§ 404.1520a(e), 416.1468. If the Appeals Council denies a request for review or otherwise upholds an unfavorable decision by an ALJ, the claimant can seek judicial review in an appropriate federal district court. *See* 42 U.S.C. § 405(g); *see also id.* § 1395ff(b)(1)(A).

## II. ADMINISTRATIVE PROCEDURAL HISTORY

In July 2012, Plaintiff filed an application for DIB under Title II of the Social Security Act.[6] (Dkt. No. 8-6 at 3). Through the application, as later amended, Plaintiff claimed that he was disabled since May 1, 2012 (*see* Dkt. No. 8-3 at 165-166), primarily due to degenerative disc disease with radiculopathy, pleural effusion, neuropathy, chronic pain syndrome, osteoarthritis in

---

[4] Section 404.1527(c) applies to claims filed before March 27, 2017, such as the claim here. 20 C.F.R. § 404.1527.

[5] The Appeals Council may also conduct a review on its own motion within sixty days of the issuance of the ALJ's decision. 20 C.F.R. § 404.969.

[6] Plaintiff filed another application for DIB in August 2017, which was eventually determined a duplicate of the 2012 application. (*See* Dkt. No. 9-5 at 6, 9). The 2017 application is immaterial for purposes of the ensuing review and, thus, will not be addressed further.

the hips and knees, polycythemia, deep vein thrombosis, essential tremors, depression, and alcohol dependence (*see* Dkt. No. 9-5 at 9-11, 55-77).

Following the SSA's initial denial of Plaintiff's application, a series of administrative proceedings ensued over the next ten years, resulting in multiple unfavorable decisions, Appeals Council reviews, and administrative remands. (*See generally* Dkt. No. 8-4).

On October 23, 2020, an ALJ issued a decision unfavorable to Plaintiff. (Dkt. No. 9-6 at 26-42). The ALJ determined that Plaintiff: (i) had injuries not severe enough for DIB; (ii) retained the functional capacity for light work with limited exposure to respiratory irritants; (iii) could perform past relevant work; and (iv) was not otherwise disabled through June 30, 2019, or his date last insured. (*Id.* at 32-42).

On February 18, 2021, the Appeals Council denied Plaintiff's request for review (*id.* at 57-61), finding "no reason under [the] rules to review the [ALJ's] decision" (*id.* at 57).

On April 15, 2021, Plaintiff filed an action for judicial review of the 2020 decision in the United States District Court for the Southern District of Texas, McAllen Division. *Fitzgerald v. Saul*, Civil Action No. 7:21-CV-0148, Dkt. No. 1. Plaintiff claimed primarily that the ALJ erred in omitting evidence of his mental limitations from the RFC assessment. *See id.*, Dkt. No. 15 at 5, 9-14. The Commissioner moved to reverse and remand for further administrative proceedings, or further fact-finding, without identifying specific issues to be addressed upon remand. *Id.*, Dkt. No. 20. Plaintiff did not oppose this motion, *id.*, Dkt. No. 20 at 3, and the District Court reversed and remanded without addressing the merits of Plaintiff's claim, *id.*, Dkt. No. 23.

Upon the judicial remand, the Appeals Council vacated the 2020 decision and remanded Plaintiff's case to a different ALJ. (Dkt. No. 9-6 at 19-22).

On February 7, 2023, the new ALJ held a hearing in Plaintiff's case. (Dkt. No. 9-5 at 40-88). Plaintiff, who was represented by counsel, testified as to his ostensible disability. (*Id.* at 53-77). Lauren Petkoff, a life care planner and vocational expert (Dkt. No. 10-3 at 19-21), testified concerning Plaintiff's ability to complete hypothetical tasks and perform related employment duties (Dkt. No. 9-5 at 77-86).

On February 28, 2023, the ALJ issued an adverse decision. (*Id.* at 2-21). The ALJ determined that Plaintiff was not disabled through the last date insured of June 30, 2019. (*Id.* at 20). According to the ALJ, any impairments did not meet or equal the severity of one of the listed impairments, and Plaintiff could perform light work with certain limitations, including his past relevant work as a maintenance supervisor and administrative clerk. (*Id.* at 9-20).

On June 27, 2023, Plaintiff filed the Complaint in this case without pursuing further administrative steps.[7] (Dkt. No. 1).

### III. EVIDENTIARY RECORD

#### A. Medical Evidence

Central to the Complaint are the medical source statements from Plaintiff's treating physicians, Dr. Pedro E. McDougal and Dr. Jose A. Gonzalez, who evaluated Plaintiff's physical and mental functioning based on multiple diagnoses.[8]

---

[7] Claimants are not required to request Appeals Council review of a post-judicial-remand decision by an ALJ prior to seeking another round of judicial review. *See* 20 C.F.R. §§ 404.984(a), (d), 405(g); *see also Ayala v. Saul*, 2020 WL 1902571, at *2 (N.D. Tex. Feb. 3, 2020), *report and recommendation adopted*, 2020 WL 746625 (Feb. 14, 2020).

[8] Each of the medical source statements consists of a three-page standardized questionnaire with checkboxes and limited space for comments. Given their concise nature, the parties argue over the proper weight to afford these statements. (*See* Dkt. No. 14 at 4-5; *see also* Dkt. No. 17 at 2). The weight of the "checkbox format" need not be considered further, however, insofar as the Magistrate Judge concludes that the ALJ articulated good cause for discounting the opinions at issue based on other factors.

Dr. McDougal, an internist and geriatrician (Dkt. No. 9-5 at 11), completed multiple sets of treating source statements, including those dated October 10, 2016, July 24, 2017, and March 9, 2020 (Dkt. No. 9-3 at 345-47, 374-76, 694-702, 713-20, 794-99).

Through the 2020 statement, Dr. McDougal listed multiple diagnoses for which he provided treatment, including chronic hepatitis C, chronic pain syndrome, essential tremor, chronic diarrhea, polycythemia,[9] and an ulcer of the limb due to chronic venous insufficiency.[10] (*Id.* at 794).

In terms of physical functioning, Dr. McDougal opined that Plaintiff: (i) could walk half a block without rest; (ii) could sit for 20 minutes or stand for 15 minutes continuously; (iii) could sit or stand-and-walk for less than two hours in an eight-hour workday; (iv) required 15 to 20 minute breaks every 15 to 20 minutes to shift positions; (v) needed leg elevation "as much as possible" for 30 percent of a workday; (vi) required an assistive device for standing and walking; (vii) could not lift or carry any amount of weight; (viii) could handle, finger, and reach for one percent of a workday; (ix) needed to avoid extreme temperatures, high humidity, and various respiratory irritants and chemicals; (x) could not twist, stoop, crouch, or climb; and (xi) would be absent from work more than twice a month. (*Id.* at 794-96).

Concerning Plaintiff's mental limitations, Dr. McDougal's 2020 statement did not list any relevant diagnosis, whereas his earlier statements had included diagnoses of alcohol dependence and depression. (*Id.* at 694, 700, 713, 717, 797). Nevertheless, Dr. McDougal opined in his 2020 assessment that Plaintiff could adhere to basic standards of neatness and cleanliness without limitations. (*Id.* at 797). He further noted that, in a limited but satisfactory

---

[9] "Polycythemia refers to an increase in the total red cell mass of the blood." *Mitchell v. Colvin*, 2016 WL 379811, at *1 n.1 (W.D. Va. Jan. 29, 2016).

[10] "Venous insufficiency is a problem with the flow of blood from the veins of the legs back to the heart." *Michalec v. Colvin*, 629 F. App'x 771, 773 n.2 (7th Cir. Dec. 10, 2015).

manner, Plaintiff could: (i) interact appropriately with the general public; (ii) maintain socially appropriate behavior; (iii) travel in unfamiliar places; and (iv) use public transportation. (*Id.*).

Dr. Gonzalez, a vascular surgeon (Dkt. No. 9-5 at 19), completed a treating source statement dated April 28, 2020 (Dkt. No. 9-3 at 801-03). Dr. Gonzalez listed a diagnosis of "left lower extremity venous insufficiency." (*Id.* at 801). Dr. Gonzalez opined that Plaintiff: (i) could walk half a block without rest; (ii) could sit for 45 minutes or stand for 20 minutes continuously; (iii) could sit or stand-and-walk for less than two hours in an eight-hour workday; (iv) required 15-minute breaks every ten minutes; (v) needed leg elevation with two pillows for an unspecified duration; (vi) did not require an assistive device for standing and walking; (vii) could occasionally lift and carry up to ten pounds of weight; (viii) could handle, finger, and reach for five percent of a workday; (ix) needed to avoid extreme temperatures, high humidity, and various respiratory irritants and chemicals; (x) could not twist, stoop, or climb but could crouch occasionally; and (xi) would be absent from work more than twice a month. (*Id.* at 801-03).

In addition to the treating physicians' opinions, the following evidence is particularly relevant to the ensuing discussion.[11]

Plaintiff has an extensive history of spinal cord problems (*see* Dkt. No. 9-4 at 241), which were confirmed by MRI results from December 2019 (*see id.* at 98-100). Plaintiff underwent several surgeries, including lower back surgery in 2010 (Dkt. No. 9-3 at 53) and spinal cord stimulator insertion in 2012 (Dkt. No. 9-4 at 241). In August 2012, nerve tests revealed: (i) nerve problems in the right leg, possibly due to mild damage in the lower back nerve root or as part of a broader nerve condition; (ii) mild nerve issues in the left foot; and (iii) nerve irritation in the left mid-lower back, potentially acute or chronic. (Dkt. No. 9-3 at 221-22). By 2013,

---

[11] The relevant evidence is grouped according to Plaintiff's ostensible impairments, mirroring the ALJ's approach to analyzing the medical evidence in the record.

Plaintiff was under pain management and was, at one point, prescribed a walker. (*Id.* at 404, 410). Plaintiff's condition gradually ameliorated thereafter, such that, in July 2013, Dr. Jose G. Dones-Vasquez, Plaintiff's treating orthopedist, advised Plaintiff to "stay active" and that "since there [were] no structural pat[h]ologies[,] eventually he [would] get better[.]" (*Id.* at 401). Plaintiff's ambulation largely remained within the normal range. (*Id.* at 335, 339, 422, 470, 479, 482, 493, 549, 551-52, 554-55, 562, 659-62, 673-75, 684, 775-77; Dkt. No. 9-4 at 5-42, 128-29, 131-54, 224, 362-64, 379, 402-04, 427-28, 430-31, 433-34, 446-48, 459-60, 462-64, 493-94). Even where he did exhibit gait disturbance or decreased sensation in the lower extremities, there was no indication that Plaintiff ambulated with substantial difficulty. (*See, e.g.*, Dkt. No. 9-3 at 224, 484, 487, 490, 500, 649-51).

Plaintiff also has a history of neck pain and restricted range of motion. MRI results from 2010 and 2012 showed degenerative changes and disc issues at various levels. (*See* Dkt. No. 9-3 at 8, 247, 264-65). In late 2012, he was diagnosed with a herniated cervical disc and chronic pain syndrome, for which he received pain medication and steroid injections. (*See id.* at 194-202). In January 2013, he underwent neck fusion surgery. (*Id.* at 323). At a post-operative visit the next month, he reported reduced pain with some residual soreness. (*Id.* at 321).

Plaintiff also reported hip and knee pain. X-ray results from July 2011 showed arthritis and joint space narrowing of the bilateral hips. (*Id.* at 32). As for Plaintiff's knee pain, osteoarthritis was ruled out as a diagnosis in August 2012. (*Id.* at 224). Plaintiff was prescribed steroid injections and a topical anti-inflammatory. (*Id.* at 30). Notwithstanding complaints of hip pain, Plaintiff reported being "very active and exercis[ing] daily." (*Id.* at 29).

From January 1, 2018, through June 30, 2019—the period relevant to Plaintiff's claim, Plaintiff's treating physicians, including Dr. Achal Patel, a neurosurgeon (Dkt. No. 10-4 at 69),

implemented non-invasive treatment for Plaintiff's chronic pain stemming from spinal, hip, and knee issues, chiefly involving opioid use for pain management (*see, e.g.*, Dkt. No. 9-4 at 184, 427-32, 489-92). The record lacks evidence of physical therapy, steroid injections, or surgery during this time. Physical examinations generally revealed normal gait and unassisted ambulation (*see id.* at 19-38, 168-71, 178-82, 190-93, 221-24, 470-71, 483-85, 493-96, 498-99), which was subsequently corroborated by the circumstance that Plaintiff did not use an assistive device six months after the relevant period (*id.* at 344).

Plaintiff was also diagnosed with essential tremors with "Parkinsonian" features during the relevant period. (Dkt. No. 9-4 at 19). He was, however, not diagnosed with Parkinson's disease. A neurological evaluation from December 2015 indicated a slight tremor in the upper extremities but found motor strength and gait to be intact. (Dkt. No. 9-3 at 548-50). Subsequent evaluations showed persistent slight tremors, which were managed with medication. (*See id.* at 551-63; Dkt. No. 9-4 at 6, 16-19, 22-26, 39-43, 53, 67, 560-62).

Plaintiff also has a history of polycythemia, which led to blood clotting and deep vein thrombosis in 2016 and 2020. (*See, e.g.*, Dkt. No. 9-3 at 437-44, 450-57, 567-75, 704-07; Dkt. No. 9-4 at 8-10, 241-43). During the relevant period, Dr. Habib Ghaddar, Plaintiff's treating oncologist, noted that Plaintiff was "clinically stable," advised discontinuation of testosterone, and recommended periodic phlebotomy. (*See* Dkt. No. 9-4 at 253-55). Even without blood-thinning medication, Plaintiff continued to show no swelling and maintained normal hemoglobin levels. (*Id.* at 241-43, 247-49; Dkt. No. 10-5 at 221-33).

Lastly, during the relevant period, Plaintiff developed pleural effusion, or a collection of fluid in the lungs. (*See, e.g.*, Dkt. No. 9-4 at 19, 39). In November 2018, he underwent a procedure to drain fluid from his chest. (*Id.* at 39-43). Subsequent treatment included antibiotic

medication and insertion of a chest tube. (*Id.* at 62). By February 2019, Plaintiff reported improvement, and respiratory findings were normal. (*Id.* at 23-27). In May 2019, a physical examination, laboratory tests, and nocturnal pulse oximetry—or the measurement of blood oxygen saturation during sleep—revealed only mild breathing difficulties. (*Id.* at 19-23).

## B. **Hearing Testimony**

At the hearing before the ALJ, Plaintiff testified as to his medical conditions, functional limitations, and work history. (Dkt. No. 9-5 at 53-77).

Plaintiff reported balance issues, falling, inability to hold his head up, and disorientation. (*Id.* at 55). He then described his pain levels on a numerical scale of 0 to 10, with 10 being severe enough to head to a medical emergency room. (*Id.* at 56). Plaintiff reported: (i) low back pain at the severity of 7/10, radiating down his legs, especially on the left side; (ii) hip pain as severe as 8/10; (iii) mid-back pain as severe as 6/10; and (iv) neck pain as severe as 8/10. (*Id.* at 56-58, 63). Regarding mobility, Plaintiff stated that he used an upright walker, could stand for three to four minutes, and sit for five to ten minutes continuously. (*Id.* at 60-61). He also stated that he experienced daily tremors affecting his ability to hold objects like a pencil or a book. (*Id.* at 73). Plaintiff further testified to needing assistance with personal hygiene, being unable to prepare meals or do household chores, and experiencing sleep disturbances extensive enough that he would fall asleep mid-conversation. (*Id.* at 62-63, 71-72, 75-76).

As to his work history, Plaintiff testified in 2013 and 2017 that he worked as a general contractor, then transitioned, when he could no longer perform that job, to self-employment at the flea market business, which he operated with his wife. (Dkt. No. 8-3 at 45-46, 103-04, 106; Dkt. No. 9-5 at 52). When he became unable to perform general maintenance at the flea market,

he shifted to paperwork duties. (Dkt. No, 8-3 at 106; Dkt. No. 9-5 at 52). He stated that any earnings in January 2019 would have been from the flea market. (Dkt. No. 9-5 at 54-55).

Petkoff, the vocational expert, also testified at the hearing. Petkoff classified Plaintiff's past relevant work as: (i) maintenance supervisor, DOT 184.167-050—light work both per the DOT and as performed; and (ii) a composite job of maintenance supervisor and administrative clerk, DOT 219.362-010—light work both per the DOT and as performed, with an SVP level of 4. (*Id.* at 78-79). Petkoff identified sorter, DOT 209.687-022, and appointment clerk, DOT 237.367-010, as potential sedentary jobs that Plaintiff might be able to perform based on transferable skills from his past work. (*Id.* at 79-80). She noted, however, that computer skills were essential for these positions, and without them, no skills would transfer. (*Id.* at 81-84). She opined that an individual who would be absent from work two or more days per month on a regular basis, or off work-related tasks more than fifteen percent of the time, would not be employable in the competitive workforce. (*Id.* at 85-86).

## IV. DETERMINATION BY THE ALJ

In applying the first step of the sequential process described above, the ALJ determined that Plaintiff, through his last date insured of June 30, 2019, engaged in substantial gainful activity from May to December of 2012. (Dkt. No. 9-5 at 8-9). The ALJ, however, determined that Plaintiff had at least one continuous twelve-month period without substantial gainful activity, thereby satisfying the insured status requirements of the SSA. (*Id.* at 6, 9).

At step two, the ALJ determined that Plaintiff suffered from severe impairments, including degenerative disc disease with radiculopathy, pleural effusion, neuropathy, chronic pain syndrome, osteoarthritis of the hips and knees, polycythemia, deep vein thrombosis, and essential tremors. (*Id.* at 9-10).

Moving to step three, the ALJ determined that Plaintiff's impairments did not meet or exceed the severity of those listed in the applicable appendix to the SSA regulations. (*Id.* at 11-12). For example, the ALJ determined that, for Plaintiff's spinal impairments to meet the severity of the qualifying impairments listed in the appendix, the evidence needed to demonstrate "a documented medical need for an assistive device or the inability to use the upper extremities[,]" which was not supported by the record. (*Id.*). In conducting the PRT analysis, the ALJ determined as follows:

> [Plaintiff's] medically determinable mental impairments of depression and alcohol use/dependence, considered singly and in combination, did not cause more than minimal limitation in [his] ability to perform basic mental work activities and were therefore nonsevere.
>
> In making this finding, I have considered the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 [C.F.R.,] Part 404, Subpart P, Appendix 1). These four areas of mental functioning are known as the "paragraph B" criteria.
>
> The first functional area is understanding, remembering, or applying information. In this area, [Plaintiff] had no limitation. On examination, [Plaintiff] was active and alert with good judgment and intact memory.
>
> The next functional area is interacting with others. In this area, [Plaintiff] had no limitation. On examination, [Plaintiff] exhibited normal mood and affect.
>
> The third functional area is concentrating, persisting, or maintaining pace. In this area, [Plaintiff] had a mild limitation. [Plaintiff] has reported psychomotor retardation, and on some examinations, he has shown slowed speech. However, on other examinations, [Plaintiff] has displayed normal speech rate and tone.
>
> The fourth functional area is adapting or managing oneself. In this area, [Plaintiff] had no limitation. On examination, [Plaintiff] demonstrated intact judgment and insight.
>
> Because [Plaintiff's] medically determinable mental impairments caused no more than "mild" limitation in any of the functional areas, they were nonsevere.
>
> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental

residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments. Therefore, the following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

In 2017 and 2020, [Dr. McDougal, Plaintiff's] treating internist and geriatrician, offered his opinion of [Plaintiff's] mental limitations due to alcohol dependence. These opinions are given little weight. Dr. McDougal is a treating source, and as such is familiar with [Plaintiff's] condition. However, Dr. McDougal does not specialize in psychiatry or mental health. Furthermore, Dr. McDougal's opinions are unsupported by his own mental status observations, which show that [Plaintiff] is active and alert with normal mood, normal affect, intact insight, intact judgment, and intact memory. Finally, Dr. McDougal's opinions are inconsistent with other examinations of record showing normal mood and affect appropriate to the situation with generally unremarkable findings[.]

(*Id.* at 10-11 (citations omitted)).

Accordingly, the ALJ moved to step four and determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), with certain exclusions such as:

frequent rotation/flexion of the neck; frequent fingering and handling; occasional climbing of ramps/stairs, stoop, kneel, crouch, crawl, and overhead reach with the left upper extremity; [any use of] ladders, ropes, scaffolds, unprotected heights, dangerous moving machinery, uneven terrain, and vibration; [any exposure to] extreme cold, heat, humidity, or wetness; [any] concentrated exposure to environmental irritants (fumes, dusts, gases, odors) or poorly ventilated areas[.]

(*Id.* at 12-19). For reference, "light work" refers to work that involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). While "the weight lifted may be very little," light work may require "a good deal of walking or standing, or . . . sitting most of the time with some pushing and pulling of arm or leg controls." *Id.* An individual is "capable of performing a full or wide range of light work" if they can "substantially" perform all associated activities. *Id.* Also, unless there are further limiting factors, an individual capable of light work is also cable of sedentary work. *Id.*

In determining that Plaintiff could perform such light work, the ALJ considered Plaintiff's medical records, the hearing testimony, and the opinions of the state agency medical consultants. (*See* Dkt. No. 9-5 at 13-19). The ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained [elsewhere] in [the] decision." (*Id.* at 17).

The ALJ gave little weight to the opinions of Plaintiff's treating physicians, Dr. McDougal and Dr. Gonzalez. The ALJ determined that Dr. McDougal's opinions—

> [were] unsupported by the physical examination findings, which typically show[ed] normal and unassisted gait, as well as normal strength, range of motion, and reflexes in the bilateral upper and lower extremities, as well as normal range of motion of the spine. Furthermore, Dr. McDougal's opinions [were] inconsistent and generally unsupported with [Plaintiff's] limited treatment during the relevant period.

(*Id.* at 19 (citations omitted)). The ALJ applied similar reasoning in affording little weight to Dr. Gonzalez's opinion. (*See id.*).

The ALJ also gave little weight to the opinions of the state agency medical consultants, Dr. Betty Santiago and Dr. Leigh McCary. (*Id.* at 18). The consultants opined, through brief one-page forms, that Plaintiff had medically determinable impairments of lumbar spinal stenosis—or narrowing in the spinal canal of the lower back—and prostatitis—or inflammation of the prostate gland. (*See* Dkt. No. 9-3 at 168, 170). The ALJ noted, however, that their opinions were provided in 2012, and "since then, significant medical evidence ha[d] been received and more importantly, [Plaintiff's] insured status ha[d] changed." (Dkt. No. 9-5 at 18).

The ALJ primarily relied on the interpretation of the objective medical evidence and Plaintiff's longitudinal treatment history. (*Id.* at 12-19). For instance, the ALJ highlighted that

the "records from the relevant period mostly show[ed Plaintiff] walking with a normal and unassisted gait" and that there was "no evidence of any invasive treatments during the relevant period." (*Id.* at 17). As to certain conditions, such as pleural effusion and polycythemia, the ALJ observed that medical interventions, including medication management, achieved notable improvement or stabilization of the associated symptoms. (*Id.* at 17-18).

Continuing with step four, the ALJ determined that Plaintiff could perform past relevant work as a maintenance supervisor and administrative clerk. (*Id.* at 20). In doing so, the ALJ primarily relied on the vocational expert testimony. (*See id.*).

Accordingly, the ALJ concluded that Plaintiff was not disabled and denied his application for DIB. (*Id.*).

## V. STANDARD OF REVIEW

### A. Scope

Judicial review of the Commissioner's final decision under 42 U.S.C. § 405(g) is limited to two inquiries: (i) whether the decision is supported by substantial evidence; and (ii) whether the Commissioner correctly applied the relevant legal standards. *Bednorz v. Comm'r of Soc. Sec.*, 2023 WL 5846804, at *2 (W.D. Tex. Sept. 11, 2023) (citing *Kinash v. Callahan*, 129 F.3d 736, 738 (5th Cir. 1997) (per curiam)).

Evidence is substantial where it is more than a scintilla but less than a preponderance, such that a reasonable mind could accept it as adequate to support a conclusion. *Bessey v. Berryhill*, 2019 WL 1431599, at *2 (W.D. Tex. Mar. 29, 2019) (quoting *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995) (per curiam)) (quotations omitted). Substantiality, in this context, requires the weighing of four elements of proof: (i) objective medical facts; (ii) diagnoses and opinions of treating and examining physicians; (iii) the claimant's subjective evidence of pain

and disability; and (iv) the claimant's age, education, and work history. *Martinez*, 64 F.3d at 174 (citing *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (per curiam)). A reviewing court may not reweigh the evidence, try the issues de novo, or substitute their judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing *Haywood v. Sullivan*, 888 F.2d 1463, 1466 (5th Cir. 1989) (per curiam)). All a court may do is scrutinize the record for substantial evidence supporting the Commissioner's decision. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (citing *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987)). A final decision of the Commissioner supported by substantial evidence must be affirmed. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (per curiam). A court may not find a lack of substantial evidence unless there is (i) a conspicuous absence of credible choices or (ii) no contrary medical evidence. *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988) (per curiam) (citing *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (per curiam)).

"Procedural perfection in administrative proceedings is not required[,]" and thus an administrative judgment will be vacated only where "the substantial rights of a party have been affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam). The procedural improprieties at issue must "cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988) (per curiam). Otherwise, an error is harmless "when it is inconceivable that a different administrative conclusion would have been reached absent the error." *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003) (per curiam). Therefore, to establish error that warrants remand, a plaintiff must show that that the SSA's decision might have been different absent the error. *See Martinez v. Saul*, 2020 WL 5536814, at *17 (N.D. Tex.

Aug. 31, 2020) (citing *Bornette*, 466 F. Supp. 2d at 816), *report and recommendation adopted sub nom. Martinez o/b/o Marquez v. Saul*, 2020 WL 5531485 (N.D. Tex. Sept. 15, 2020).

## B. <u>Remand</u>

A district court is authorized by 42 U.S.C. § 405(g) to remand a social security case to the Commissioner for further administrative action. *See Melkonyan v. Sullivan*, 501 U.S. 89, 101-02 (1991). This authorization is limited to that afforded by § 405(g)'s sentence four or sentence six. *Id.* "[R]emand orders must either accompany a final judgment affirming, modifying, or reversing the administrative decision in accordance with sentence four, or conform with the requirements outlined by Congress in sentence six." *Id.*

The fourth sentence of section 405(g) authorizes a district court to issue a remand order upon the pleadings and transcript of the record, either affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C. § 405(g). A sentence-four remand is appropriate when the evidence on the record is insufficient to support the Commissioner's final decision and further fact-finding is necessary. *See Kleja v. Barnhart*, 220 F. Supp. 2d 1330, 1334-35 (M.D. Fla.), *aff'd*, 49 F. App'x 290 (11th Cir. 2002). Essentially, a sentence four remand is a determination that the SSA erred in deciding to deny benefits. *Hoa Hong Van v. Barnhart*, 483 F.3d 600, 605 (9th Cir. 2007).

A sentence-six remand is a different kind of remand insofar as the district court does not affirm, modify, or reverse the Commissioner's decision; a case is remanded, rather, "because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding." *Melkonyan*, 501 U.S. at 98.

## VI. ANALYSIS

The two main issues raised by Plaintiff, as summarized above, will be addressed in turn.

### A. <u>Opinions from Treating Physicians</u>

Plaintiff contends that the ALJ failed to properly evaluate the medical opinions of his treating physicians, Dr. McDougal and Dr. Gonzalez, in assessing his functional capacity. (Dkt. No. 13 at 1, 5-13). Specifically, Plaintiff argues that the ALJ improperly discredited these opinions based on a lay interpretation of the medical evidence. (*Id.* at 6-12). According to Plaintiff, this contravenes the SSA's administrative policy—which generally warrants heightened deference to opinions of treating physicians, particularly when the opinions are mutually consistent in indicating a claimant's inability to tolerate full-time competitive work. (*Id.* at 6-7). Plaintiff also complains that the ALJ failed to develop the record by not seeking additional medical expert assessments. (*Id.* at 12-13).

Plaintiff's contentions are without merit. The ALJ explained that the opinions were "inconsistent and generally unsupported" by the objective medical evidence. (Dkt. No. 9-5 at 19). The ALJ's weight determination—and related RFC determination—is supported by substantial evidence.

The SSA's framework for evaluating medical opinions generally affords special deference to those of a claimant's treating sources. 20 C.F.R. § 404.1527(c). An ALJ, however, may assign a treating physician's opinion little or no weight when good cause is shown, that is, where the treating physician's opinion—relative to other experts—"is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton v. Apfel*, 209 F.3d 448, 455-56 (5th Cir. 2000). When an ALJ intends to reject or give little weight to a treating specialist's opinion, they must consider

each of the factors set forth in 20 C.F.R. § 404.1527(c) and provide an explanation for their determination. *See Williams v. Comm'r of Soc. Sec. Admin.*, 2016 WL 4495851 at *3 (E.D. Tex. Aug. 25, 2016) (citing *Newton*, 209 F.3d at 453); *see also Kneeland v. Berryhill*, 850 F.3d 749, 760-61 (5th Cir. 2017). Again, the § 404.1527(c) factors are as follows: (i) the physician's length of treatment of the claimant and frequency of examination; (ii) the nature and extent of the treatment relationship; (iii) the support of the physician's opinion afforded by the medical evidence of record; (iv) the consistency of the opinion with the record as a whole; (v) the specialization of the treating physician; and (vi) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c). An ALJ's explanation for rejecting a medical opinion is sufficient insofar as a careful reading of the decision demonstrates the thorough consideration of the medical opinion. *See Winston v. Berryhill*, 755 F. App'x 395, 403-04 (5th Cir. 2018).

Indeed, the ALJ did not explicitly enumerate the governing factors provided in § 404.1527(c). Nevertheless, the substance of the ALJ's opinion demonstrates that most of these factors were indeed considered. (*See* Dkt. No. 9-5 at 11, 15, 18-19). The ALJ discussed the nature and extent of Plaintiff's treatment relationship with Dr. McDougal and Dr. Gonzalez (*see id.* at 15-16, 18-19), which was in accordance with § 404.1527(c)(2)(i), (ii). As to Dr. McDougal's diagnoses of depression and alcohol dependence, the ALJ emphasized that Dr. McDougal did not specialize in psychiatry or mental health (Dkt. No. 9-5 at 11), which consideration aligned with § 404.1527(c)(5). Most significantly, while Plaintiff emphasizes the congruence between the opinions of Dr. McDougal and Dr. Gonzalez, the ALJ addressed their lack of supportability and consistency relative to the other medical evidence (*see* Dkt. No. 9-5 at 11, 18-19), consistent with § 404.1527(c)(3), (4). The ALJ cited multiple physical examinations in the record—some of which were conducted by Plaintiff's other treating physicians—

demonstrating normal and unassisted gait, strength, range of motion, and reflexes in Plaintiff's extremities and spine. (Dkt. No. 9-5 at 19 (citing Dkt. No. 9-4 at 26, 42, 60, 364, 561)).[12] Moreover, the ALJ observed that Dr. Patel employed "limited treatment[,]" chiefly involving medication management. (*Id.* (citing Dkt. No. 9-4 at 56-60)).[13] The ALJ's narrative reasoning, read holistically, demonstrates an adequate consideration of the medical opinions at issue before discounting them. *See Winston*, 755 F. App'x at 403-04. This explanation was based primarily on the physical examination findings and is supported by substantial evidence. *See Newton*, 209 F.3d at 456; *see also Wycoff v. Berryhill*, 2019 WL 699995, *3 & n.7, *12 (S.D. Tex. Feb. 19, 2019) (holding that finding of RFC for frequent fingering and handling was proper where physical examinations of the claimant's hands and wrists were "essentially normal," exhibiting normal grip strength and motor function).

Plaintiff also criticizes the ALJ for not seeking more recent medical assessments, which he contends could have altered the case outcome. (Dkt. No. 13 at 12-13). Contrary to Plaintiff's assertion, however, SSA regulations impose no duty on the ALJ to procure updated medical opinions. *See Moody v. Berryhill*, 2019 WL 3412530, at *6 (S.D. Tex. July 29, 2019) (collecting cases); *see also Dominguez v. Astrue*, 286 F. App'x 182, 186 (5th Cir. 2008) (per curiam).

For these reasons, the Magistrate Judge concludes that the ALJ's RFC assessment is consistent with the governing factors and thus demonstrates good cause for discounting the medical opinions.

---

[12] The documents cited to by the ALJ appear in the administrative record as follows: Exhibit C48F/25, 41, 59; Exhibit C53F/103; and Exhibit C54F/185.

[13] The documents cited to by the ALJ appear in the administrative record as Exhibit C48F/55-59.

**B. Consideration of Mental Limitations in RFC Determination**

Plaintiff contends that the ALJ erred by failing to properly consider his mild mental limitations in determining the RFC. (Dkt. No. 13 at 1, 6, 13-20). According to Plaintiff, having found medically determinable depression resulting in a mild limitation during the PRT analysis, the ALJ was obligated to either incorporate the determination into the RFC analysis or explain its omission. (*Id.* at 13-20).

This argument is without merit. As pointed out by the Commissioner, ALJs may properly exclude non-severe mental limitations from the RFC assessment where substantial evidence supports the PRT determinations that mental limitations do not significantly affect the claimant's capacity to perform work-related activities. *Jeansonne v. Saul*, 855 F. App'x 193, 196-98 (5th Cir. 2021) (per curiam). Again, the ALJ found no limitations in Plaintiff's ability to: (i) understand, remember, or apply information; (ii) interact with others; or (iii) adapt or manage himself. (Dkt. No. 9-5 at 10). In each case, the ALJ pointed to record evidence showing the impairments' lack of any effect on Plaintiff's ability to work. (*Id.*). As to the Plaintiff's ability to concentrate, persist, or maintain pace, the ALJ found any limitation to be "mild." (*Id.*). Concerning the mild mental limitation, the ALJ noted that "[Plaintiff] has reported psychomotor retardation, and on some examinations, he has shown slowed speech[,]" but "on other examinations, [Plaintiff] has displayed normal speech rate and tone." (*Id.* (citations omitted)). Based on those findings, the ALJ concluded that his "medically determinable mental impairments of depression and alcohol use/dependence, considered singly and in combination, did not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities and were therefore nonsevere." (*Id.*). The ALJ' PRT analysis—and related RFC determination—is supported by substantial evidence.

Moreover, following her step-two analysis of the severity of Plaintiff's mental limitations, the ALJ explicitly stated, "the following residual functional capacity assessment reflects the degree of limitation I have found in the 'paragraph B' mental functional analysis." (*Id.* at 11). This reference of the PRT findings, albeit succinct, effectively incorporated those findings into the RFC assessment. A recent case out of the Houston Division affirmed the adequacy of incorporating PRT findings into RFC assessments using language nearly identical to that employed by the ALJ here. *See Saucedo v. Kijakazi*, 2022 WL 789684, at *5 (S.D. Tex. Feb. 25, 2022) (citing *Murray v. Saul*, 2021 WL 3721447, at *1 (W.D. Tex. Aug. 23, 2021)) ("To the extent that [the claimant] argues that the ALJ should have included further discussion of [the claimant's] mental impairment in the paragraphs following the RFC finding, that was not necessary. The ALJ may incorporate by reference his step-two discussion into his RFC finding."), *report and recommendation adopted*, 2022 WL 784476 (S.D. Tex. Mar. 15, 2022). Such incorporation was deemed sufficient insofar as the ALJ's PRT analysis "closely examined several of [the claimant's] medical records" and "found no more than a mild limitation in any of the four broad areas of mental functioning set out in the disability regulations." *See Saucedo*, 2022 WL 789684, at *3, 5. In the instant case, again, the ALJ's PRT analysis adequately addressed the impact of Plaintiff's mild limitation on his functioning. (*See* Dkt. No. 9-5 at 10). The ALJ's incorporation was thus appropriate and valid.

For these reasons, the Magistrate Judge concludes that the ALJ did not err in declining to include Plaintiff's mild mental limitations in the RFC assessment.

## VII.  CONCLUSION

### *Recommended Disposition*

For these reasons, the Magistrate Judge respectfully RECOMMENDS that the Complaint (Dkt. No. 1) be DENIED, that the final decision of the Commissioner be AFFIRMED, and that this civil action be DISMISSED.

### *Notice to the Parties*

Within fourteen (14) days after being served a copy of this report, a party may serve and file specific, written objections to the proposed recommendations.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  Failure to file written objections within fourteen (14) days after service shall bar an aggrieved party from de novo review by the District Court on an issue covered in this report and from appellate review of factual findings accepted or adopted by the District Court, except on grounds of clear error or manifest injustice.

DONE at McAllen, Texas this 30th day of September 2024.

J. SCOTT HACKER
United States Magistrate Judge